**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**MELVIN J.**

                              **Plaintiff,**                    **23-CV-00160-HKS**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**

───────────────────────────────

**DECISION AND ORDER**

As set forth in the Standing Order of the Court regarding Social Security Cases subject to the May 21, 2018 Memorandum of Understanding, the parties have consented to the assignment of this case to the undersigned to conduct all proceedings, including the entry of final judgment, as set forth in 42 U.S.C. § 405(g). Dkt. #16.

**BACKGROUND[1]**

On June 10, 2020, plaintiff, at the age of 42, protectively filed a claim for benefits under Title II of the Social Security Act, alleging an onset date of June 6, 2019. Dkt. #3, pp. 246-247.

In a Disability Report filed on June 17, 2020, plaintiff alleged he was disabled due to neck injury, right knee injury, low back pain, high blood pressure, and anxiety. Dkt. #3, p. 275.

───────────────────

[1] Record citations use the page number(s) generated by the Court's electronic filing system.

Plaintiff's claim was denied initially on December 2, 2020, and on reconsideration on February 12, 2021. Dkt. #3, pp. 127, 145. Plaintiff requested a hearing, and a telephonic hearing before Administrative Law Judge ("ALJ") Lori Romeo was held on August 25, 2021. Dkt. #3, pp. 68-101. Plaintiff appeared with his counsel. *Id.*

Upon examination by the ALJ, plaintiff testified that he completed high school and some college. Dkt. #3, p. 74. He testified that he lives alone.

The ALJ noted that because plaintiff was receiving state unemployment benefits, he was representing that he was able to work, but plaintiff testified that he was not sure what jobs he could do. Dkt. #3, p. 75. He testified that he believed he was unable to work due to a neck injury, a right knee injury, a back injury, high blood pressure, Achilles tendinosis, and a high body mass index. Dkt. #3, pp. 76-77.

As to daily activities, plaintiff testified that he can dress himself but his girlfriend does the household chores. Dkt. #3, pp. 77-78. He is able to drive, and he testified that the pain in the areas mentioned was, on average, a 5 out of 10 without medication. Dkt. #3, p. 78. He takes Tramadol, which helps with the pain and reduces it to a 3 out of 10. Dkt. #3, pp. 78-79.

Next, plaintiff testified that sleeping and excessive walking exacerbate his pain, and he can only walk about ten to fifteen minutes before he is uncomfortable. Dkt.

#3, p. 79. He also can only sit for about twenty minutes before he needs to stand up. *Id.* Plaintiff testified that he has not been prescribed a cane. Dkt. #3, p. 80. As to lifting and carrying, plaintiff testified that he could lift between ten and twenty pounds. *Id.*

The ALJ next noted that plaintiff takes medications for pain and high blood pressure, and plaintiff testified that they did not cause any side effects. *Id.* The ALJ also noted that plaintiff had undergone shoulder and neck surgery, and plaintiff testified that he was still attending physical therapy for those issues. *Id.* He also testified that he recently finished shockwave therapy on his Achilles tendon, and that his foot doctor said it could be four to six weeks before he felt any improvement. *Id.*

Plaintiff next testified that he had discontinued treatment for anxiety approximately a year prior, although he feels that the anxiety would prevent him from working. Dkt. #3, p. 81. Specifically, he testified that he has periods of panicking, sweating, and extreme nervousness. Dkt. #3, p. 82. He felt that working under the pressure of a production quota would trigger such attacks, and that he previously worked in such a job. *Id.* At that time, he was taking Xanax for his anxiety, which calmed him down but made him feel lethargic. Dkt. #3, p. 83. He testified that he did not think he would be able to work even if he resumed taking Xanax. *Id.*

Upon examination by his counsel, plaintiff testified since his neck surgery in 2019, there has been no change in his symptoms. Dkt. #3, p. 84. He experiences numbness and tingling in the right side of his neck which travels to his elbow. *Id.*

As to the tendinosis, it is just above his heel, and he also has problems with his right wrist, which caused him to go to the emergency room a week or two before the hearing. Dkt. #3, p. 85. He is right-handed, he feels a stinging sensation in the wrist, and he wears a brace but can still use his fingers. Dkt. #3, p. 86. However, he testified that he has issues with writing and typing. Dkt. #3, pp. 86-87.

Plaintiff's counsel next asked him about his back, and plaintiff testified that he always has back pain, as well as aching, some numbness, and stiffness. Dkt. #3, p. 87. His doctor has recommended surgery for his back. *Id.* Plaintiff testified that he also has pain in his knees and extreme weakness in the right knee. *Id.*

The ALJ then asked vocational expert ("VE") Christine Spaulding to classify plaintiff's past work, and she testified that one past job would correspond to general laborer within the rubber industry, a medium exertion job but heavy as performed. Dkt. #3, p. 90. In addition, plaintiff also worked in a terra cotta business loading and unloading kilns, which would correspond to kiln burner helper, also a medium exertion job heavy as performed. *Id.*

For clarification, the ALJ asked plaintiff what his duties were at Dunlop, and plaintiff testified that he first worked in the warehouse running traditional equipment in the truck and bus line, unloading and loading tires. Dkt. #3, p. 92. Later, plaintiff ran various automated machines. *Id.* In that position, he lifted between 30 and 40 pounds, and the position was a standing one in which he fed materials into a machine. Dkt. #3, p. 93.

The ALJ then asked the VE if that testimony changed her classification, and she responded that it did not, *i.e.*, that both jobs at Dunlop corresponded with general laborer. Dkt. #3, p. 94.

Next, the ALJ asked the VE to assume a person of plaintiff's age, education, and work experience who can perform sedentary work; engage in unlimited pushing and pulling other than limited by the sedentary weight limit; reach at desk level, but no overhead reaching; occasionally climb stairs, but no ladders, ropes, or scaffolds; occasionally stoop, but no kneeling, crouching, or crawling; and cannot work on an assembly line at a constant pace, but can be expected to work at normal production standards. Dkt. #3, pp. 95-96.

The VE testified that such person could not perform plaintiff's past work, but that he could perform the sedentary jobs of document preparer, sorter, and addresser. Dkt. #3, pp. 96-97.

As to the sorter job, the VE testified that "it's the type of SVP job that can be learned in 30 days or even less." Dkt. #3, pp. 96-97. The ALJ asked the VE if her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations ("SCO"), and she stated: "Yes, although the DOT and SCO did not break down reaching directionally. And also the sorter that I included as a[n] SVP 3 job." Dkt. #3, p. 97.

On examination by plaintiff's counsel, the VE testified that the hypothetical person could still perform the jobs she identified even if he required a sit/stand option where he needed to change positions every twenty minutes. Dkt. #3, p. 97. The ALJ then asked if the person would still need to remain on task if he had a sit/stand option, and the VE said that was correct. Dkt. #3, p. 98.

Plaintiff's counsel next asked the VE if the person would be able to perform the identified jobs if he was limited to occasional handling and fingering with his dominant hand, and the VE testified that he would not because the jobs require at least frequent bilateral use of the hands. Dkt. #3, p. 98.

Plaintiff's counsel also asked whether the person could perform the jobs if he was limited in not only overhead reaching but also to only occasional reaching in all directions bilaterally. Dkt. #3, p. 99. The VE testified that he could not, and that no sedentary jobs could be performed with that limitation. *Id.*

Next, plaintiff's counsel asked the VE whether the person could perform the jobs if he was off task for 15% of the workday. The VE testified that he could not and that such an off-task rate would preclude all work. *Id.* She also testified that most employers will tolerate no more than 10% off-task time. *Id.* Finally, plaintiff's counsel asked about absenteeism, and the VE testified that consistent absences of more than one day per month would not be tolerated. Dkt. #3, p. 100.

On February 10, 2022, the ALJ issued an unfavorable decision finding that plaintiff was not disabled. Dkt. #3, pp. 38-57. The Appeals Council denied plaintiff's request for review on December 23, 2022, Dkt. #3, pp. 6-12, and this action followed.

## DISCUSSION AND ANALYSIS

### Legal Standards

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). If the evidence is susceptible to more than one rational interpretation, the Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

To be disabled under the Social Security Act ("Act"), a claimant must establish an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.905(a). The Commissioner must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. 20

C.F.R. § 416.920(a). At step one, the claimant must demonstrate that she is not engaging in substantial gainful activity. 20 C.F.R. § 416.920(b). At step two, the claimant must demonstrate that she has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related activities. 20 C.F.R. § 416.920(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to disability benefits. 20 C.F.R. § 416.920(d). If the impairment does not meet the criteria of a disabling impairment, the Commissioner considers whether the claimant has sufficient RFC for the claimant to return to past relevant work. 20 C.F.R. § 416.920(e)-(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to the Commissioner to demonstrate that the claimant could perform other jobs which exist in significant numbers in the national economy, based on claimant's age, education, and work experience. 20 C.F.R. § 416.920(g).

Here, the ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff had not engaged in substantial gainful activity since June 6, 2019, the alleged onset date; (2) plaintiff has the severe impairments of obesity; neck impairment, status post-surgery; knee impairment; lumbar impairment; and, as of March 2021, diagnosis of plantar fibroma and Achilles tendon tendinitis;  (3) plaintiff's impairments do not meet or medically equal any listed impairment; (4) plaintiff has the

RFC to perform sedentary work[2], with the following limitations: he can push and pull at the sedentary weight level; reach at desk level but no reaching overhead; can climb stairs occasionally but should not work on ladders or scaffolds; can occasionally stoop but should not kneel, crouch, and crawl; and cannot work on an assembly line at a constant pace but can meet normal production standards;  (5) plaintiff is unable to perform any past relevant work; (6) considering plaintiff's age, education, work experience, and residual functional capacity, plaintiff is able to perform the sedentary jobs of document preparer, sorter, and addresser; and (6) plaintiff was not, therefore, disabled within the meaning of the SSA from June 6, 2019, to the date of the ALJ's decision. Dkt. #3, pp. 44-52.

Pursuant to the *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), applicable to claims filed on or after March 27, 2017, the Commissioner is no longer required to afford any specific evidentiary weight to medical opinions, but is obligated to consider all medical opinions and evaluate their persuasiveness based on the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, with particular importance placed upon consistency and supportability. *Jacqueline L. v. Comm'r of Soc. Sec*, 515 F. Supp.3d 2, 7 (W.D.N.Y.  2021) (citing 20 C.F.R. § 416.920c(a) & (c)). To allow a reviewing court to

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

trace the path of an ALJ's reasoning, an ALJ is required to explain their consideration of the supportability and consistency factors by pointing to specific evidence in the record to support the ALJ's findings regarding medical opinions. *Id.* (citing 20 C.F.R. § 416.920c(b)(2)).

With respect to supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the medical findings will be. *Id.* (citing 20 C.F.R. § 416.920c(c)(1)). Similarly, with respect to consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinions will be. *Id.* (citing 20 C.F.R. § 416.920c(c)(2)). Supportability focuses on the fit between medical opinion offered by the source and the underlying evidence presented by the source to support that opinion, while consistency focuses on how well a medical source opinion is supported by the entire record. *Rosario v. Comm'r of Soc. Sec*, 20 Civ. 7749, 2022 WL 819810, at *8 (S.D.N.Y. Mar. 18, 2022). "Even though ALJs are no longer directed to afford controlling weight to treating source opinions – no matter how well supported and consistent with the record they may be – the regulations still recognize the 'foundational nature' of the observations of treating sources, and 'consistency with those observations is a factor in determining the value of any [treating sources] opinion.'" *Id.* (quoting *Shawn H. v. Comm'r of Soc. Sec.*, Civil Action No. 2:19-cv-113, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020)) (alteration in original).

**Challenges to the ALJ's Decision**

Plaintiff makes two challenges to the ALJ's decision. He argues that: (1) the ALJ erred in evaluating the medical opinion evidence; and (2) the ALJ erred at step five because the Commissioner failed to show that jobs exist in significant numbers in the national economy that plaintiff can perform given his RFC. Dkt. #8-1, pp. 16-31.

### *Evaluation of Medical Opinion Evidence*

For context, before the ALJ considered the medical opinions in this matter, she discussed other record evidence. First, she reviewed the disability report that plaintiff filed with his application for benefits, as well as his hearing testimony regarding his physical limitations. Dkt. #3, pp. 45-46. The ALJ concluded, however, that plaintiff's reported symptoms were not entirely consistent with the medical evidence. *Id.*

The ALJ reviewed plaintiff's medical records dating back to September 2016, when he injured his right knee at work. Dkt. #3, p. 46. She noted that, after plaintiff underwent surgery in June 2017, he was able to return to work at full duty in October 2018.

Next, the ALJ reviewed medical records relating to a neck injury that plaintiff suffered at work in May 2019. An MRI in May 2019 showed some straightening of the cervical spine and shallow disc protrusions. Dkt. #3, p. 46. However, an EMG performed on September 17, 2019 showed no electrodiagnostic evidence of left cervical radiculopathy. *Id.*; Dkt. #3, p. 937.

Regarding plaintiff's lower back pain, the ALJ noted that an MRI performed in 2019 showed some degenerative changes in plaintiff's lumbar spine. *Id.*, Dkt. #3, p. 911.

The ALJ then reviewed records of spinal examinations of plaintiff performed by neurosurgeon Dr. Eric P. Roger in 2019 and 2020. Dkt. #3, pp. 46-47. On September 13, 2019, Dr. Roger noted that plaintiff had moderate difficulty standing up from a seated position due to pain, but that he used no assistive devices. Dkt. #3, p. 941. Plaintiff had 5/5 strength in his right upper extremity and 4/5 in the left, with a firm grip in both. *Id.* Dr. Roger also noted that plaintiff had full strength in both lower extremities and negative straight leg raises. *Id.* Another examination the following month yielded similar results, with Dr. Roger noting that plaintiff had only mild difficulty rising from a seated position. *Id.*; Dkt. #3, p. 932.

In an examination on March 24, 2020, plaintiff reported to Dr. Roger that he was still having significant low back pain, but the ALJ noted, *inter alia*, that Dr. Roger found that plaintiff had full strength in both upper and lower extremities bilaterally; he was able to walk with an antalgic gait; he had only mild difficulty rising from a seated position; and he used no assistive walking devices. Dkt. #3, pp. 47, 911.

Next, the ALJ noted that, a month after plaintiff had a cervical fusion in October 2020, he reported to Dr. Roger that he had significant improvement in his pain, his arm pain was resolved, and his neck pain was at 4/10 in severity. Dkt. #3, p. 47, 399.

Similarly, in January 2021, plaintiff reported to Dr. Roger that he had significant improvements in his pain and that his arm pain and tingling were resolved. *Id.*

In the summer of 2021, plaintiff saw Dr. Michael Calabrese at Medical Care of Western New York at Buffalo. Dkt. #3, pp. 1170-1179.[3] The ALJ noted that plaintiff reported increased pain with lifting and other activities, as well as neck pain and numbness and tingling, but he also reported improvement of his motion and stiffness with physical therapy. Dkt. #3, pp. 1170, 1175. The examinations also showed 4/5 strength in plaintiff's left upper extremity. Dkt. #3, pp. 1172, 1177.

Also in the summer of 2021, plaintiff complained to Medical Care of Western New York at Buffalo of increased left knee pain but, as the ALJ observed, the examination showed that the range of motion in his left knee was intact, he had only a mildly antalgic gait, and he walked without an assistive device. Dkt. #3, p. 47. An x-ray of plaintiff's left knee performed on June 2, 2021 showed the bones intact and "no acute osseous abnormality of the left knee or severe degenerative change." Dkt. #3, pp. 47, 1162.

Next, the ALJ turned to medical records regarding plaintiff's foot pain, which he first reported to Dr. Peter Riznky in March 2021. Dkt. #3, p. 47. The ALJ noted that Dr. Riznky diagnosed plaintiff with plantar fibroma bilaterally and advised him to take an anti-inflammatory, wear supportive shoes with orthotics, not go barefoot, and do stretching exercises. Dkt. #3, pp. 47, 1167-1168.

---

[3] The ALJ's decision refers to these records as those of Dr. Bennet, but that appears to be a scrivener's error. Dkt. #3, p. 47.

Plaintiff again presented to Dr. Riznky in June 2021, complaining of new Achilles tendinitis pain which started when he was playing more actively at the gym. Dkt. #3, p. 1164. The ALJ noted that plaintiff told Dr. Riznky that his previous complaints of plantar fasciitis were "mildly achy but much better." Dkt. #3, pp. 47, 1164. On examination, Dr. Riznyk noted that plaintiff had "[g]ood muscle strength to all prime movers of the foot and ankle with adequate muscle tone and symmetry bilaterally." Dkt. #3, p. 1165.

Next, the ALJ reviewed medical records reflecting that plaintiff received Dolorcast shockwave therapy for his Achilles tendon in July and August 2021, which he tolerated well. Dkt. #3, pp. 48, 1188-1189.

The ALJ also noted that plaintiff was diagnosed with right wrist tendinitis in August 2021, and that he was advised to rest, elevate, use ice, and take Tylenol or Ibuprofen. Dkt. #3, pp. 48, 1199. Treatment notes reflect that plaintiff reported he used a wrist brace when weightlifting, which helped with the pain, and he was provided with a wrist splint. Dkt. #3, pp. 1200-1201. The ALJ noted that plaintiff still had 5/5 grip strength, and x-rays were within normal limits. Dkt. #3, p. 1202.

Finally, the ALJ considered records of a routine follow-up appointment in September 2021, during which plaintiff reported that he had stopped physical therapy for his knee but continued physical therapy for his neck. Dkt. #3, p. 48. Plaintiff reported

continued pain in his right hand and feet, and he was referred to pain management and continued on his medications. Dkt. #3, pp. 48, 1196.

Against this backdrop, the ALJ turned to the medical opinion evidence. As relevant here, plaintiff argues that the ALJ erred in her treatment of the opinion of Dr. Robert M. Ungerer ("Dr. Ungerer"), who conducted an independent medical examination of plaintiff on October 9, 2019 on behalf of the New York State Workers' Compensation Board. Dkt. #3, pp. 750-756.

In his report, Dr. Ungerer opined, in relevant part:

> In my opinion[,] he can work five days a week, four hours a day with restrictions. Restrictions are such that he can climb stairs one at a time. He can stand for 20 minutes at a time out of every 30 minutes. He can walk for 15 minutes out of every 30 minutes. He likely can lift 10 pounds, *keeping it close to his body on an occasional basis*. While he cannot tell me how much he can lift, based on muscle strength testing particularly testing his elbow flexion, it is likely he can lift 10 pounds up to waist height with his right arm and with his left arm on an occasional basis.

Dkt. #3, p. 755 (emphasis added).

The ALJ found this opinion "somewhat persuasive." Dkt. #3, p. 48.[4] Plaintiff argues that, in so doing, the ALJ failed to address the supportability and consistency factors. Dkt. #8-1, p. 17. The Court disagrees.

---

[4] The Court notes that the ALJ stated that two other doctors, Drs. Gregory Bennett and Michael Calabrese, adopted Dr. Ungerer's opinion, but that appears to be a misreading of the record. Dkt. #3, p. 48. Drs. Bennett and Calabrese reviewed and quoted Dr. Ungerer's opinion in their reports under a section titled "Coordination of Care (Reports, Consultations, IME)," but it does not appear that they adopted Dr. Ungerer's opinion. Dkt. #3, pp. 565-566, 1170-1179. Indeed, as plaintiff

The ALJ explained her assessment as follows:

> I find the doctors' opinions somewhat persuasive as these doctors examined the claimant and noted the claimant had abnormal range of motion and needed *surgery but also noted he retained generally 4/5 strength in the left upper extremity with no need for [a] cane. Further the claimant had normal EMG results. However, the doctors' determination that the claimant is limited to working four hours out of eight is not supported by any of the treating notes or why this limitation is noted and so that portion of the opinions is not supported and therefore, not persuasive.*

Dkt. #3, pp. 48-49 (emphasis added).

Thus, the ALJ did, in fact, expressly address supportability by noting that the four-hour-per-day limitation to which Dr. Ungerer opined was not supported by plaintiff's treatment notes, and Dr. Ungerer did not explain the basis for that limitation. While brief, such an explanation adequately addresses supportability. *See Samantha M. v. Comm'r of Soc. Sec.*, 24-CV-657-LJV, 2026 WL 265575, at *3 (W.D.N.Y. Feb. 2, 2026) (finding no error in ALJ's explanation that medical opinion was "largely supported by the evidence she cited," except for limitation which was "not consistent with the record").

Moreover, although the ALJ did not use the word "consistency" in this section of her decision, it is clear to the Court from the balance of the discussion that she

---

points out, in February 2020, Dr. Calabrese stated that he disagreed with Dr. Ungerer that the plaintiff was, at that time, unable to work in any capacity. Dkt. #3, p. 566. Dr. Calabrese's reports from 2021 do not contain this remark. Dkt. #3, pp. 1170-1179. In any event, even if this was a mistake on the ALJ's part, the Court concludes it is harmless because, as discussed herein, the ALJ's decision was supported by substantial evidence.

found that limitation at odds with "the physical examinations and diagnostic tests discussed above." Dkt. #3, p. 49.

It is well established that an ALJ's failure to use the words "supportability" and "consistency" is a procedural error not warranting remand where it is clear that the ALJ considered those factors. *Tanya R. v. Comm'r of Soc. Sec.*, 1:24-CV-00375 EAW, 2026 WL 111320, at *4 (W.D.N.Y. Jan. 15, 2026) ("Although the ALJ did not use the words 'supportability' and 'consistency,' it is clear that the ALJ considered these factors in evaluating Dr. Hoffman's opinion.") (citation omitted); *Jennifer S. v. Comm'r of Soc. Sec.*, 24-CV-334-LJV, 2026 WL 98423, at *3-4 (W.D.N.Y. Jan. 14, 2026) (ALJ's failure to explicitly discuss consistency factor was procedural error; remand not required because ALJ's reasoning could be gleaned from the record); *Angela H.-M. v. Comm'r of Soc. Sec.*, 631 F. Supp.3d 1, 10 (W.D.N.Y. 2022) ("Although the ALJ did not specifically use the words 'supportability' and 'consistency' in discussing Dr. Bing's opinion, it is clear from the record that the ALJ found his opinion to be inconsistent and not supported by other evidence in the record, including the historical record and records from Plaintiff's treating sources.").

Next, plaintiff argues that the ALJ's failure to incorporate Dr. Ungerer's limitation that any lifting should be only close to plaintiff's body was harmful because the RFC limited plaintiff to only overhead reaching. Dkt. #8-1, p. 19. This is without merit.

Dr. Ungerer did not opine that plaintiff had *any* limitations in reaching. Dkt. #3, p. 755. Plaintiff's argument rests on the flawed assumption that reaching one's arms in all directions would mean always doing so while holding something weighing up to ten pounds, rather than empty-handed. This is illogical.

The Court also notes that plaintiff's assertion that the "record contains only one substantive medical opinion stated in functional terms, that of Dr. Unger," *id.*, is not accurate. In fact, the record contains the opinions of two state agency consultants, Drs. Miller and Koening, who opined that plaintiff could perform the functional components of light work, with some postural limitations. Dkt. #3, pp. 8-17.

The ALJ found these opinions unpersuasive because the doctors did not examine plaintiff, and they did not have access to all the medical evidence presented at the hearing level. Dkt. #3, p. 49. Plaintiff assigns no error to this assessment, and the ALJ ultimately reached an RFC more restrictive than these opinions. *See Waledahmad A. v. Comm'r of Soc. Sec.*, # 1:22-cv-398-DB, 2024 WL 3722697, at *9 (W.D.N.Y. Aug. 8, 2024) ("The Second Circuit and this Court have repeatedly affirmed decisions where the ALJ incorporated additional RFC restrictions beyond what a medical source identified.") (citations omitted).

Next, plaintiff appears to equate Dr. Ungerer's opinion that plaintiff could work no more than a four-hour workday with being off task more than 10% of the workday, which would preclude employment. Dkt. #8-1, p. 18. However, plaintiff cites no authority

for such a proposition. In fact, Dr. Ungerer's opinion included no off-task limitation, *i.e.*, a percentage of time that the plaintiff would be unable to maintain concentration, persistence, and pace during the workday. Rather, the four-hour limitation is, substantively, a limitation to part-time work, but the record contains no medical opinion that plaintiff would be off task during working hours, whether full-time or part-time.

Finally, plaintiff invokes the familiar argument that, because the ALJ did not rely on any medical opinion when arriving at the specific limitations in plaintiff's RFC, she created an evidentiary gap in the record and triggered a duty to further develop the record. Dkt. #8-1, pp. 20-21. This argument fails. *See Justin B. v. Comm'r of Soc. Sec.*, 20-CV-01810-MJR, 2022 WL 17592399, at *6 (W.D.N.Y. Dec. 13, 2022 ) ("Contrary to Plaintiff's assumption, neither the Commissioner's regulations and rulings, nor relevant case law in the Second Circuit, require an ALJ to rely exclusively on a medical source opinion in articulating the RFC finding."). *See also Lakeisha P. v. Comm'r of Soc. Sec.*, CASE NO. 1:24-cv-00306 (JGW), 2025 WL 3506959, at *9 (W.D.N.Y. Dec. 8, 2025) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citations and internal quotation marks omitted).

For these reasons, the Court finds no basis for remand based on the ALJ's evaluation of the medical opinion evidence.

***Step Five Analysis***

Plaintiff next challenges the ALJ's finding at step five that plaintiff could perform a significant number of jobs in the national economy. Dkt. #12-1, pp. 18-22.

Plaintiff argues that the ALJ erred in relying on the VE's testimony that plaintiff could perform the job of sorter because the VE testified that job could be learned in less than three months—a specific vocational preparation ("SVP")[5] factor of 2—whereas the DOT classifies the sorter job as a semi-skilled job with an SVP factor of 3. Dkt. #8-1, pp. 22-25.

Social Security Ruling ("SSR") 00-4P, which clarifies the SSA's standards for using a VE, states:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).

---

[5] SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." United States Department of Labor, *Dictionary of Occupational Titles* (4th ed. Rev. 1991) Appendix C, 1991 WL 688702 (Jan. 1, 2016).  An SVP of 3 is over one month up to three months, while an SVP of 2 is anything beyond a short demonstration up to one month. *Id.*

This ruling further explains that "[n]either the DOT nor the VE or VS automatically 'trumps' when there is a conflict." *Id.* Rather, the ALJ "must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." *Id.*

This ruling further provides that SSA adjudicators "may not rely on evidence provided by a VE, VS, or other reliable source of occupational information if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions." *Id.* at *3.

As an example, the ruling discusses the skill level definitions set forth in the regulations and their corresponding SVPs: "unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

The ruling then states:

> ***Although there may be a reason for classifying an occupation's skill level differently than in the DOT, the regulatory definitions of skill levels are controlling***. For example, VE or VS evidence may not be relied upon to establish that unskilled work involves complex duties that take many months to learn, because that is inconsistent with the regulatory definition of unskilled work.

*Id.* (emphasis added).

As relevant here, the regulatory definitions for unskilled, semi-skilled, and skilled work are set forth in 20 C.F.R. § 404.1568.

Here, the VE testified that it was her opinion that the sedentary job of sorter could be learned in 30 days or less and that there are an estimated 46,000 such jobs in the national economy. Dkt. #3, pp. 96-97. The ALJ asked the VE if her testimony was consistent with the DOT, and the VE noted that the sorter job is an SVP 3 job and that her testimony was based on her professional experience. Dkt. #3, p. 97.

This testimony, and the ALJ's reliance on it, thus complied with SSR 00-4P. The conflict between the DOT's classification of the sorter job as an SVP 3 and the VE's testimony that it could be learned in less than 30 days—commensurate with an SVP 2— was identified, and the VE explained that her testimony was based on her professional experience. The ALJ recounted this reasoning in her decision. Dkt. #3, p. 51.

Moreover, as noted above, SSR 00-4P expressly contemplates such a situation: "[T]here may be a reason for classifying an occupation's skill level differently than in the DOT." 2000 WL 1898704, at *3.

Further, contrary to plaintiff's argument, this testimony did not contravene the ruling's proviso that the regulatory definitions of skill levels are controlling. *Id.* That is, the VE's testimony, while in conflict with the DOT, in no way departed from the *regulatory*

*definition* of semi-skilled work found in 20 C.F.R. § 404.1568(b), which defines the abilities required to perform such work but which is silent as to the time required to learn it.

Stated differently, the VE's departure from the DOT's SVP assessment did not, substantively, convert the sorter position from a semi-skilled job to an unskilled job, as defined in the Code of Federal Regulations.[6]

Notably, plaintiff's counsel did not question the VE's qualifications and did not ask any questions about her testimony regarding the sorter position, including her testimony that there are an estimated 46,000 sorter jobs in the national economy.

While no Social Security regulation or ruling defines "significant number" for purposes of the step five analysis, "[c]ourts have held that numbers varying from 9,000 upwards constituted 'significant.'" *Angi W. v. Comm'r of Soc. Sec.*, 21-CV-0557 (CJS), 2023 WL 2595008, at *11 n.8 (W.D.N.Y. Mar. 22, 2023) (finding that 22,494 charge account clerk jobs in national economy was "significant number") (citations omitted).

For this reason, "the Court need not consider Claimant's argument that the other two jobs the VE identified—addresser and document preparer—were obsolete." *Id.* at *11. *See* Dkt. #8-1, pp. 27-30.

---

[6] The Court notes that none of the cases cited by plaintiff in his reply brief regarding the sorter job speak to the issue before the Court. Dkt. #15, p. 4.

In sum, the Court concludes that the ALJ's decision was supported by substantial evidence and that the Commissioner's determination must be upheld.

## CONCLUSION

Based on the foregoing, plaintiff's motion for judgment on the pleadings (Dkt. #8) is denied, and the Commissioner's motion for judgment on the pleadings (Dkt. #12) is granted.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

DATED:       Buffalo, New York
             February 11, 2026

                         **_s/ H. Kenneth Schroeder, Jr._**
                         **H. KENNETH SCHROEDER, JR.**
                         **United States Magistrate Judge**